STEELMET, INC., Plaintiffs-Appellants, Cross-Appellees,

Jarrell R. Jackson, Intervening Plaintiff-Appellee,

v.

CARIBE TOWING CORP., Marine Exploration Co., Inc., Defendant Third Party Plaintiff-Appellants,

Alabama-Puerto Rico Barge Line, Inc., Defendant,

and

Frank J. Hall & Company, Third-Party-Defendant-Appellee,

American Marine Underwriters, Calvert Fire Insurance Co., Third-Party-Defendants-Appellees, Cross-Appellants.

No. 82–6142.

United States Court of Appeals, Eleventh Circuit.

Jan. 13, 1986.

Donovan, Maloof, Culp & Kennedy, New York City, for Steelmet, Inc.

John B. Culp, Jr., G.J. Rod Sullivan, Jr., Jacksonville, Fla., for Steelmet, Inc.

Carl R. Nelson, Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, Fla., for United Kingdom Mut. S.S. Assur. Ass'n, et al.

Edward F. Gerace, Tampa, Fla., for Caribe and Marine Exploration Co.

Richard R. McCormack, Miami, Fla., for American Marine Underwriters and Calvert Fire Ins. Co.

John D. Kallen, Hayden & Milliken, Wm. E. Cassidy, Miami, Fla., for Jarrell R. Jackson.

## ON PETITION FOR REHEARING

(Opinion Nov. 29, 1984, 11 Cir., 747 F.2d 689).

Before GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges.

GODBOLD, Chief Judge:

The major issue raised in the petition for rehearing filed by Calvert Fire and American Marine Underwriters concerns whether, in a maritime action in federal court in Florida, there can be maintained a direct action against an insurer brought pursuant to Florida law. We addressed this matter in our decision at 747 F.2d at 696.

Steelmet sought to file an amended complaint stating a direct action against Calvert Fire and AMU.[1] The district court did not rule on whether the amendment could be filed but rather said it would allow Steelmet to participate in proceedings as if it had a direct action. On appeal Steelmet urged that it had been improperly denied the right to a direct action; Calvert and AMU asserted Steelmet had no right to maintain such an action and, in any event, was permitted to participate at the trial as though it did have the right. The legal consequences of all this were so uncertain that we addressed the direct action issue

---

1. In their rehearing petition Calvert and AMU assert that AMU is not an insurer but rather a managing agent for Calvert. Steelmet's proposed amendment named both. The status of AMU can be determined on remand, and, to the extent our decision might be viewed as an adjudication of AMU's status, the petition for rehearing is GRANTED. For simplicity, and without substantive consequences, we refer to the insurer in the singular.

and ruled on it in an effort to be helpful to the parties on remand. We thought that we were netting a minnow and found ourselves embraced by an octopus. Petition for rehearing and response have elevated what appeared to be a side issue of minor interest into a major controversy. Amici from the marine insurance industry have joined in, and decisions in several other maritime cases out of Florida are being withheld pending our acting on the petition.

We concluded, 747 F.2d at 696, that Steelmet could bring a direct action. We cited *Shingleton v. Bussey*, 223 So.2d 713, 716 (Fla.1969), in which the Florida Supreme Court had held that, as a matter of Florida public policy, a third party beneficiary under a motor vehicle liability policy could maintain a direct action against the insurer. Also we cited *Quinones v. Coral Rock, Inc.*, 258 So.2d 485, 486 (Fla. 3d D.C.A.1972), in which the Florida Third District Court of Appeal held that *Shingleton* and following cases permitted joinder, in a suit for maritime personal injuries, of the maritime insurer on a protection and indemnity maritime policy.

The parties and amici have briefed legislative developments in Florida since *Shingleton* and *Quinones* were decided and subsequent caselaw as well. For reasons that follow we conclude that *Shingleton* and *Quinones* are a part of a correct analysis but, by themselves, do not give us an answer. Rather, we are required to examine the interplay between federal admiralty law and state law concerning the right to maintain a direct action against an insurer.

■ Federal admiralty law confers no general right to sue an insurance company directly, *Continental Oil Company v. Bonanza Corp.*, 677 F.2d 455, 460 (5th Cir. 1982), nor does it contain any specific bar against such an action. A state may, however, create a direct action against a maritime insurer, at least where the state action is not in conflict with any feature of substantive admiralty law or any remedy peculiar to admiralty jurisdiction. *Cushing v. Maryland Casualty Co.*, 198 F.2d 536, 539 (5th Cir.1952), *reversed on other grounds, sub nom. Maryland Casualty Company v. Cushing*, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). In the Supreme Court, four justices in *Maryland Casualty* were of the view that the Louisiana statute was foreclosed by the Limitation Act, 46 U.S.C. § 183, and four justices thought the contrary. To avoid impasse the former four justices joined with Justice Clark in the conclusion that the Limitations Act could be applied so that there was not any conflict between it and the Louisiana statute in question.

*Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), concerned whether an insurer under a maritime policy could deny liability on grounds of breach of an express warranty that was invalid under Texas law. The Court found that the policy was a maritime contract and thus within federal jurisdiction under the Admiralty Clause of the Constitution. But, it held, Congress has not taken over the regulation of marine insurance contracts in general or of specific provisions like the one there in question, thus no issue of conflict between state law and federal statute was presented. But, the Court went on to say, that did not answer the question presented, since a large part of the existing rules that govern admiralty has been fashioned by the Supreme Court, and states can no more override such validly fashioned judicial rules than they can override acts of Congress. Thus, the crucial questions narrowed down to whether there was a judicially established federal admiralty rule governing policy provisions like the one in question, and if not whether the Court should fashion one. 348 U.S. at 314, 75 S.Ct. at 370. The ultimate holdings were that there was no such admiralty rule and, because of the state interests in insurance and its regulation, none should be fashioned.

In *Maryland Casualty* the Limitation Act had been applied so as to avoid any

conflict with the state statute. In *Wilburn Boat* the Court specifically held there was no conflict. Next, in *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), the Court held that the New York statute of frauds was inapplicable to a dispute arising out of an oral contract concerning a seaman's maintenance and cure. The Court applied the "established rule of ancient respectability" that oral contracts are regarded as valid by maritime law. 365 U.S. at 734, 81 S.Ct. at 889. It noted that the contract might have been made anywhere in the world and that the validity of it should be judged by one law, while on the other hand there was no peculiar state or local concern. The case was not, the Court held, one where state law supplemented the remedies available in admiralty for the vindication of maritime rights. It distinguished *Wilburn Boat*, stating that the application of state law was justified in that case because of the nonexistence of a conflicting maritime rule, while in *Kossick* the maritime rule existed and was entitled to predominate.

In *Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230 (5th Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970), the court considered whether the Louisiana direct action statute conflicted with the concursus provision of the Limitation Act. Applying the position of the five justices in *Maryland Casualty*, the circuit court held:

> With regard to the first matter, although four members of the Court would have voided the direct action statute because of conflict between the proceedings, five members, including Justice Clark, took a contrary position. Moreover, the right to proceed with a direct action after a limitation proceeding has been completed is an implicit holding that the policy underlying the concursus is not so strong or pervasive as to abrogate rights under the direct action statute. We hold that any conflict between the direct action statute and the federal pro-

vision for a concursus of claims in admiralty is so minimal as to be insignificant. *Id.* at 235. In short, after examining the policy underlying the admiralty provision for concursus of claims, the court held that any conflict between that admiralty provision and the state statute was insignificant.

Summarizing this body of law: One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts, and, if there is no such admiralty principle, consideration must be given to whether such an admiralty rule should be fashioned. If none is to be fashioned, the state rule should be followed. *Wilburn Boat.* If there is an admiralty-state law conflict, the comparative interests must be considered— they may be such that admiralty shall prevail, as in *Kossick*, or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect, as in *Olympic Towing*.

██ Our first step is to determine what the state law is, and the parties are sharply divided on this point. We must thread our way through the maze of whether Florida law permitted a direct action against the insurer at the time Steelmet's cause of action arose in December 1976 and when it filed its proposed amendment in 1981. In 1969 *Shingleton* stated a prevailing Florida public policy that a third party beneficiary under a motor vehicle liability policy could maintain a direct action against the insurer. The next year in *Beta Eta House Corp., Inc. of Tallahassee v. Gregory*, 237 So.2d 163 (Fla.1970), the Supreme Court applied *Shingleton* to an action against the insurer on a household liability policy. The Court noted that the purpose of *Shingleton* was to require the parties to "lay their cards on the table" in discovery proceedings, settlement negotiations, and pre-trial hearings. 237 So.2d at 165. In 1971 in *Stecher v. Pomeroy*, 253 So.2d 421 (Fla.1971), the Supreme Court held that under some circumstances there might be issues that would

make it appropriate to sever an insurer against whom a direct action had been brought but that absent such circumstances a severance should not be granted. *Quinones* followed in 1972, holding that *Shingleton* and its successor cases required that the state's public policy extend to a maritime P & I policy.

In 1976 the Florida legislature attempted to overrule *Shingleton* by adoption of Fla. Stat.Ann. § 627.7262, effective October 1, 1976 and applicable to all claims arising out of accidents occurring on or after that date. Three years later, in *Markert v. Johnston*, 367 So.2d 1003 (Fla.1979), the Supreme Court considered the constitutionality of § 627.7262. It noted that the statute was passed to overrule *Shingleton* but found the statute void because it was procedural and violated the rulemaking powers of the Supreme Court. The Florida legislature responded a second time in 1982 with a new § 627.7262, again eliminating the right of direct action. In *Van Bibber v. Hartford Accident*, 439 So.2d 880 (Fla.1983), the Florida Supreme Court found this new statute to be substantive and thus not unconstitutional and held that it did not apply to causes of action arising out of events occurring before October 1, 1982. *Randel v. General Insurance Co.*, 439 So.2d 986 (Fla. D.C.A.3d 1983), followed *Van Bibber* and reversed a trial court which, on the basis of the 1982 statute, had refused to permit a direct action against the insurer on a cause of action arising in May 1982. Finally, the Fourth District Court of Appeal, in *Osborne v. Elizabeth Massey Investment Corp.*, 467 So.2d 1095 (Fla.D.C.A. 4th 1985), held, first, that a 1979 cause of action was controlled by the law in effect at the time the cause of action arose, which was "the common law rule of *Shingleton v. Bussey,*" and, second, reaffirmed that *Shingleton* was not limited to motor vehicle liability cases but should be applied to a marine insurer.

The clear result of this body of Florida law is that Steelmet's right to bring a di-rect action is controlled by the common law rule of Florida described in *Shingleton.* The Florida legislature's first effort to overrule *Shingleton* aborted, and its second and successful effort came after Steelmet's cause of action had accrued. It makes no difference that the legislature in 1982 made a controlling determination of Florida public policy. Until the legislature acted the viable Florida public policy was that expressed by its Supreme Court in *Shingleton.* As the Supreme Court put it in *Van Bibber:*

> The regulation and supervision of insurance is a field in which the legislature has historically been deeply involved. *See* chs. 624–632, Fla.Stat. While this Court may determine public policy in the absence of a legislative pronouncement, such a policy decision must yield to a valid, contrary legislative pronouncement. In *Shingleton* we found that public policy authorized an action against an insurance company by a third-party beneficiary prior to judgment. The legislature has now determined otherwise. Our public policy reason for allowing the simultaneous joinder of liability carrier espoused in *Shingleton,* therefore, can no longer prevail. Finding that the statute is substantive and that it operates in an area of legitimate legislative concern precludes our finding it unconstitutional.

439 So.2d at 883. The Florida public policy described in *Shingleton* existed, and controlled, until the legislature overrode it.

Having determined that the Florida rule permitted Steelmet to file a direct action, we turn to consideration of whether there is an admiralty principle with which this state law conflicts, and, if there is none, whether an admiralty rule should be fashioned that covers the matter in issue. As we have noted, admiralty law neither permits nor expressly forbids direct action against a maritime insurer, so there is no conflict and, under *Wilburn Boat,* we must decide whether to fashion an admiralty rule that will control. This we decline to do.

*Wilburn Boat* was based upon state interest in regulation of insurance. *Olympic Towing* applied *Wilburn Boat* and, on the basis of Louisiana's public policy concerning insurance, vindicated that interest as against an admiralty principle because, it found, the conflict between the two was so limited as to be insignificant. *Wilburn Boat* has been sharply criticized as inconsistent with the concept of admiralty as a body of uniform national law. *See, e.g.,* G. Gilmore & C. Black, *The Law of Admiralty* 49 (2d ed. 1975).[2] True, *Wilburn Boat* is anti-uniformity. It is an advised choice by the Supreme Court in favor of state regulation of insurance, including maritime policies, so long as no overriding admiralty rule exists or is formulated. 348 U.S. at 316–19, 75 S.Ct. at 371–73. The decision points to the long tradition of state regulation of insurance and refers to the complexities and difficulties of attempts to unify insurance law on a nationwide basis, *id.* at 319, 75 S.Ct. at 373, and of Congress's reluctance to interfere even as to maritime insurance. *Id.* at 321, 75 S.Ct. at 374. We sit as judges, not as critics, and we have dutifully followed the *Wilburn Boat* analysis. In *Wilburn Boat's* third and last voyage through the Fifth Circuit, the court noted that a defense of concealment of facts from the maritime insurer was "solidly entrenched" in federal maritime law and should apply to the case but that the same rule against concealment obtained under Texas law. *Fireman's Fund Insurance Co. v. Wilburn Boat Co.,* 300 F.2d 631, 647, n. 12 (5th Cir.1962), *cert. denied,* 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962). In *Walter v. Marine Office of America,* 537 F.2d 89 (5th Cir.1976), we adhered to the *Wilburn Boat* analysis and applied Louisiana insurance law to insurance policies covering a vessel under construction, noting that such policies traditionally are not within maritime jurisdiction.

In addition to the national interests in state regulation of insurance described in *Wilburn Boat,* Florida has interests that it has described in the *Shingleton* decision. The Florida Supreme Court spoke of the rights of claimants who are members of a protected class (injured third parties who are third party beneficiaries) to pursue a speedy, realistic and adequate recovery action. The court considered that deferring the injured person's access to the courts was inconsistent with the provisions of the Florida constitution providing that courts shall be open so that persons injured shall have remedy by due course of law without denial or delay. 223 So.2d at 717. *Beta Eta* referred to the purpose of *Shingleton* as requiring the parties to "lay their cards on the table" in discovery proceedings, settlement negotiations and pre-trial hearings. *Beta Eta,* 237 So.2d at 165.

There is not a strong concern for uniformity in this case. It reaches only one class of possible parties, insurers. Unless the system fails, the insurer's obligation to pay or not will be determined correctly whatever the forum and the timing of the case. Rather the insurer's interest is in having its obligation determined after a judgment has been obtained against the insured and by a separate suit rather than concurrently with the liability suit. These interests are concerns of insurers in general. No reason is suggested to us why a maritime insurer has different concerns.[3]

Perhaps the clearest statement of the absence of any strong admiralty interest affected by a direct action statute is that of the Fifth Circuit in *Cushing v. Maryland Casualty,* 198 F.2d 536 (5th Cir.1952), *re-*

---

**2.** Even these authorities recognize that state regulatory power exists over a maritime insurance policy as to interstitial matters but view the effect of an express warranty in a maritime policy, such as was involved in *Wilburn Boat,* as a "prime issue of [maritime] insurance law" and not interstitial. *Id.*

**3.** We do not know whether even the critics of *Wilburn Boat* would view a state-created right to direct action on a maritime policy as valid because merely "interstitial." *See* n. 2, *supra.*

*versed on other grounds, sub nom. Maryland Casualty v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). The district court had the view that to give effect to the Louisiana direct action statute "would be an invasion of the field of exclusive federal jurisdiction over admiralty and maritime matters which would not only impair the characteristic features of general maritime law, but would contravene the essential purpose of limitation of liability proceedings in admiralty." *Id.* at 537. The Fifth Circuit responded:

> While [the direct action statute] confers upon an injured party a substantive right which becomes vested at the moment of the injury, it is not a right essentially maritime in character, nor one peculiar to admiralty or maritime jurisdiction, but is one which applies alike to all contracts of public liability insurance, regardless of whether the injury occurs ashore or afloat. There is nothing in it which undertakes to change the substantive admiralty law, nor does it undertake to deal with a remedy in courts of admiralty. The statute provides only an additional and cumulative remedy at law in the enforcement of obligations of indemnity voluntarily and lawfully assumed by the insurer. Thus the statute does not conflict with any feature of substantive admiralty law, nor with any remedy peculiar to admiralty jurisdiction. These suits are at law, not in admiralty.

*Id.* at 539 (footnote omitted). This holding was not affected by the Supreme Court's reversal. Nor does it seem to us to matter that the suits were at law and not in admiralty, since the court actually engaged in the balancing of state law and admiralty law interests.

Petitioners urge that Florida's common law rule set out in *Shingleton* and followed in its successors does not embrace a direct action but only permits joinder. But *Shin-*

*gleton* itself spoke exclusively in terms of a direct cause of action. *Quinones* did speak of *Shingleton* and successor cases as "insurance joinder cases." 258 So.2d at 486. The distinction has no significance in our decision. The argument is advanced as part of a contention that joinder is procedural and that Florida procedure may not override federal substantive admiralty law. But our decision does not turn on characterizations by Florida, in the legislature and in its courts, of substance versus procedure. Instead we look to the interplay between state law and admiralty law, described above. Moreover, no substantive admiralty law or policy has been pointed out to us that the Florida procedure, if it is procedure, would override.

In other cases pending before this court and awaiting this decision, the contention is made that the new version of § 627.7262 does not embrace maritime insurance in view of Fla.Stat.Ann. § 627.021(2)[4], producing a result that maritime insurers are still subject to the *Shingleton* common law rule and may be the subject of direct actions while other kinds of insurers have the protection of the § 627.7262 bar against direct actions. This issue is not before us and we do not address it.

The first two paragraphs of part IV of our opinion, appearing at 747 F.2d at 696 are VACATED.

A second issue raised by the petition for rehearing objects to that part of our opinion, at 747 F.2d at 690, that relates to the district court's having found that MEC was assignee of the charter party from Caribe and was beneficial owner of the tug and barge. The district court found that MEC was the owner of the tug in all respects except for an actual transfer of title (R. 747), and that holding is supported by the record. With respect to the tug, the objection has no merit.

With respect to the barge, Caribe asserts that it was chartered to Caribe and sub-

---

**4.**  (2) This chapter does not apply to: ...
    (c) Insurance of vessels or craft, their cargoes, marine builders' risks, marine protec-
tion and indemnity, or other risks commonly insured under marine, as distinguished from inland marine, insurance policies.

chartered to Steelmet, that the legal title remained in another company,[5] and that we erroneously held legal title passed to MEC. This too has no merit; we made no holding with respect to legal title to the barge.

We adhere to our conclusion that the district court—though it may not have used words of art—considered MEC the "beneficial owner" of the barge; the charter was assigned to MEC, and MEC added barge [and tug] to its insurance policy. With respect to the barge, the objection has no merit.

Other points raised in the petition require no discussion and are DENIED.

The petition is GRANTED in part, DENIED in part.

---

**5.** Alabama Puerto Rico Barge Lines, Inc.